## Court of Appeals.

October 3, 1893.

## PEOPLE v. CARSON J. SHELDING.

(54 St. Rep. 513; 139 N. Y. 251.)

**1. Conspiracy—Restraint of trade.**

Agreements and combination to prevent competition in prices, which are or may be hurtful to trade, constitute the crime of conspiracy. So held, where retailers in coal enter into an association under an agreement requiring the members to sell at prices fixed by the association, with penalties for disobedience, etc., for the purpose of controlling the price of coal and managing the business of the sale of coal, so as to prevent competition in price between the members of the exchange.

**2. Same—Overt act.**

There must be some act in pursuance of such agreement and done to effect its object before the crime is consummated. The raising of the price of coal, where there is a conspiracy to regulate the price, is such an overt act whether the price fixed is reasonable or excessive.

Appeal from the affirmance by the general term, fifth department, of judgment of conviction in the Niagara county sessions, on indictment for conspiracy. The indictment set forth an agreement between the defendants and others, comprising all the retail coal dealers in the city of Lockport, except one, entered into in March, 1892, to organize the "Lockport Coal Exchange," which agreement was as follows:

### CONSTITUTION AND BY-LAWS.

#### "NAME.

"The name of this exchange shall be the Lockport Coal Exchange.

#### "OBJECTS.

"The objects of this exchange shall be: To foster trade and commerce in coal, wood and all the products appertaining to the same; to protect and secure freedom from unjust and unlawful exactions; to diffuse accurate and reliable information as to the retail coal trade, and of the responsibility and standing of

customers, and other matters among its members for their mutual protection and benefit; to settle differences between its members; to produce uniformity and certainty in the customs and usages of such trade; to promote a more enlarged and friendly intercourse between merchants and dealers in coal and wood, and to provide, establish and maintain such rules and regulations as may be proper and necessary for the mutual co-operation, interest and protection of the retail dealers in coal and wood in the city of Lockport, and in furthering the coal trade interests generally.

"It shall be the duty of all members to strictly obey all the provisions of the constitution, by-laws and resolutions of the exchange, and permit to the secretary the free exercise of the duties imposed upon him in enforcing them.

### "OFFICERS.

"The officers of the exchange shall be a president and vice-president, who shall be elected by the exchange, and who shall be members of the exchange; and also a secretary and treasurer, elected by the exchange.

"The officers shall hold office for the term of one year, and until their successors are elected and shall have duly qualified, and any officer may be removed from office by the five-sixths vote of all members of the exchange at any regular or special meeting thereof.

### "COMMITTEES.

"There shall be such committees as the president or the board of trustees may from time to time designate.

### "PRESIDENT AND VICE-PRESIDENT.

"The president shall preside at all meetings of the exchange, or in his absence the vice-president. In the absence of the president and vice-president, a presiding officer shall be chosen from the members of the exchange. The president shall be ex-officio a member of all committees.

### "SECRETARY.

"The secretary shall not be a member of the exchange nor in any manner personally interested in the coal trade. He shall be elected by at least a five-sixths vote of all the mem-

bers of the exchange at a regular or special meeting, due notice of said intended election having been sent by mail to each member at his regular business address at least five days previous to the meeting.

"The secretary shall keep a record of the meetings of the exchange, a register of its members, officers and committees, and conduct all correspondence of the exchange, and perform such other duties in connection with his office as may be imposed upon him by the exchange. He shall instantly investigate all charges preferred against the members of the exchange on all well-founded suspicions without fear or favor, and conduct the investigation both to obtain proof and when presented before the exchange, and shall render his decision in each case to the exchange within ten days from the date on which charges are made, unless further time is given him by the exchange.

"He shall be permitted to see any portion of the books of any member when in pursuit of evidence of wrongdoing, and may demand an affidavit, when he thinks necessary, to refute or sustain a specific charge.

"He shall also collect material for, and compile a list of persons who are poor pay, for the mutual protection and benefit of the members of the exchange. He shall also be the keeper of the seal of the exchange, and recive such salary as may be determined upon by the exchange.

"Before the secretary shall enter upon the duties of his office, he shall make oath that he will honestly and fearlessly perform the duties prescribed by the constitution and by-laws, and that he will keep in honor and secrecy any and all information by him acquired regarding the business of the various members as he from time to time may investigate them, except any facts connected with any violation of the laws of the exchange, which the exchange or any member is entitled to know. If practicable, the secretary shall be a notary public. The secretary shall not disclose to any member of the exchange any information regarding any investigation while he is making the same.

## "TREASURER.

"The treasurer, who shall also be the secretary, shall have charge of the funds of the exchange, disburse the same, on the

order of the board of trustees, countersigned by the president, and shall report at all regular meetings; and his accounts shall be open for proper inspection at all proper times. He shall give bonds for the proper protection of the exchange.

## "MEMBERSHIP.

"The exchange shall be composed of active and associate members.

"Active members shall comprise any retail coal dealer, firm or company, who has a yard or dock, and the usual appliance for doing a coal business in the city of Lockport.

"Associate members shall comprise any individual company or firm that sells coal in the villages around Lockport, and who approves the objects of, and agrees to co-operate with the exchange. Associate members shall pay an annual fee of five dollars, and shall have all the privileges of active members, except the right of voting.

## "DISCIPLINE.

"If a member is charged with violating any provision of these by-laws, or any rule or resolution of the exchange, or of being guilty of conduct unbecoming a member, or prejudicial to its interests, or of giving short weight or over weight, he shall be summoned before the secretary to answer the charge.

"If, upon the charge and defense being heard by the secretary and he shall decide to sustain the charge, the member shall be declared 'in default' and the member shall be considered to be in default until five-sixths of all the members, at a regular or special meeting, shall vote to reinstate him as a member of the exchange in good standing.

"A member who shall be declared 'in default' shall absolutely and irrevocably forfeit all rights to all money, property or other value held by the exchange, as its own or in trust, and shall also forfeit all rights of membership in the exchange, unless he be reinstated in good standing, and no member shall be so reinstated except by a five-sixths vote of all the members of the exchange at a regular or special meeting assembled after proper notice, and only after depositing with the treasurer $100 as fee for renewal of membership.

"When a member shall be accused by the secretary, in any

open meeting of the exchange, of having violated any provision of this constitution and by-laws, or of any resolution, and evidence is lacking to absolutely refute or sustain the charge, it shall be obligatory upon such member to make proper affidavit that he has in no instance sold or delivered coal for which he has not received the full price at which the majority of the other members were selling coal of the same size at the same time, and that he has not directly or indirectly given any rebate, commission or other concession equivalent to cash, thereby actually reducing the established market price made by the Lockport Coal Exchange, and that not less than 2,000 nor more than 2,000 pounds have, in his knowledge, been sold by himself, his partner, or his employes, or delivered as a ton.

"Resignations shall be made in writing to the president or secretary, and be referred to the board of trustees for their action; but no resignation will be accepted until all dues, fines, charges and penalties against such member shall have been paid and settled.

"When the exchange, or secretary thereof, shall declare a member 'in default' the secretary thereof, shall notify every member of the exchange by mail, and such notice shall be authoritative.

"When a member defies the exchange by persistent wrongdoing, and is declared 'in default' and persistent, the secretary shall notify the shippers of coal to Lockport market that the said member is 'in default' and persistent, and for this reason is not entitled to the privileges of membership in the Lockport exchange.

## "ELECTION OF MEMBERS.

"A candidate for membership shall be proposed in writing by a member at a regular meeting of the exchange, and be recommended by two members in good standing, and at the next succeeding regular meeting to be voted upon.

"A two-thirds vote of the members of the exchange shall be requisite to elect.

## "PRICE OF ANTHRACITE COAL.

"The price of coal at retail shall, as far as practicable, be kept uniform, and it shall require a five-sixths vote of all mem-

bers of the exchange at any meeting to advance or reduce the retail price of coal, and no price shall be made at any time which amounts to more than a fair and reasonable advance over wholesale rates, or that is higher than the current prices of the exchanges at Rochester or Buffalo, when figured upon corresponding freight tariff, but at no time shall the price of coal at retail exceed one dollar above the costs of the same at wholesale, except by the unanimous vote of all the members of the exchange.

"All votes upon the price of coal shall be viva voce.

"The sale of coal shall be through the nominal channels of the trade. Soliciting shall be discouraged, and no club orders of associated buyers to reduce prices shall be considered or accepted.

"No member shall employ any person temporarily to solicit orders, either on salary or on commission, and no signs indicating 'Orders for coal' shall be displayed at groceries or other 'outside places,' and no habitual orders for second parties shall be received or filled when sent in by such agencies, whether on commission or other form of reciprocity, or only as a matter of friendship.

"Except that each member may have one place for taking orders in addition to his regular yard office.

## "MEETINGS.

"The annual meetings of the exchange shall be held on the first Monday of April in each year. The regular meeting shall be held on the first Monday of each month. Special meetings may be called by the president or upon the written request of three members, which request shall be sent to the secretary, stating the object of such meeting; and the notices of any special meeting shall state the object of the same, and no other business shall be transacted at such meeting.

"At all meetings of the exchange seven members shall constitute a quorum, but this shall not authorize them to transact any business which under the constitution and by-laws requires the vote of a greater number of the members. Any member may be represented at a meeting by an authorized person con-

nected with his business, and such persons shall be entitled to the privileges of such member.

"Any vacancies in any of the official positions of the exchange shall be filled by the board of trustees when ordered by the president (or in his absence by the vice-president) within two weeks after such vacancy occurs, or as soon thereafter as practicable.

## "MEMBERSHIP FEE.

"There shall be a membership fee of one hundred dollars, to be paid to the secretary by each member at the time of signing the constitution and by-laws, and during the first week of each month the further sum of five dollars for current expenses.

"At the end of the year, upon vote of the exchange, there shall be returned to such member the full amount of such monthly payment so paid in by the members, less the proper proportion due for each member for the current expenses of the exchange, which amount shall be deducted from each by the secretary. Any member of the exchange retiring from the coal business in Lockport in good standing with the exchange shall be entitled to receive from the treasurer the original amount paid in by said member for membership, that is, one hundred dollars, less any assessment for expenses or dues that may properly belong to such member to pay, upon filing an affidavit with the secretary that the said member has absolutely withdrawn from all direct or indirect interest in coal business in Lockport, and that during his term of membership he has not violated any of the provisions of the constitution and by-laws or resolutions of the Lockport Coal Exchange.

## "ORDER OF BUSINESS.

"At all meetings of the exchange the order of business shall be:

"Call of roll,
"Reading of minutes,
"Proposal of membership,
"Reports of committees,
"Communications, bills or notices,
"Unfinished business,
"Miscellaneous business.

"This order of business may be suspended at any meeting of the exchange by a vote of two-thirds of the members present.

## "RECORDS AND MINUTES.

"The minutes and records of the exchange shall be open at all times to the inspection of members.

## "AMENDMENTS.

"This constitution and by-laws may be amended by an affirmative vote of five-sixths of the members of the exchange at a regular meeting, provided that notice of such proposed amendment shall have been presented in writing at a previous regular meeting.

"We, the undersigned, agree to abide by the above constitution and by-laws of the Lockport Coal Exchange.

> "JAMES LENNON & SON,
> "ANGEVINE & HOOVER,
> "P. H. TUOHEY,
> "CHARLES WHITMORE & CO.,
> "J. MARC. FOWLER,
> "SHELDON N. COOK,
> "UPSON & STEVENS,
> "E. S. BROWN,
> "M. W. CARR,
> "FERRIN BROS. CO., Inc.,
> "M. McMANUS,
> "EDWARD B. JELLY."

The indictment, among other things, alleged that the agreement constituted an unlawful conspiracy to raise, increase and augment the rates and prices of coal, at retail, in the city of Lockport, and to destroy free competition among the signers of the agreement and others in the sale of coal in said city, and to compel the consumers of coal to pay therefor the prices fixed by the coal exchange. It is alleged that, in pursuance of said conspiracy, the defendants and others, members of said exchange, organized the same, elected officers, and by resolution did "fix, determine and establish the rate and price of anthracite coal at retail, in said city, at four dollars and seventy-five cents

per ton for egg, chestnut, stove and grate coal, and three dollars and seventy-five cents per ton for pea coal, and other higher rates for small quantities of the same, said rates and prices so fixed, determined and established being over seventy-five cents per ton higher and in advance of the then market price of such coal at retail in said city." The indictment alleged an unlawful intent, and concluded by an averment that the "conspiracy as aforesaid, so carried into execution as aforesaid, is of grievous injury to trade and commerce, prejudicial to the public good and welfare, against the form of the statute," etc. The proof established the execution of the agreement as alleged; the organization of the exchange by the election of officers; the fixing of the price of coal at an advance beyond the then market price, which price was thereafter charged therefor; the notification of the wholesale dealers, by the secretary, of the organization of the exchange, with the names of the members.

Other facts are set forth in the opinion.

E. M. Ashley, for appellants.

P. F. King, for respondents.

ANDREWS, Ch. J.—Section 168 of the Penal Code makes it a misdemeanor for two or more persons to conspire (sub. 6) "to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of public justice, or the due administration of the law." The Revised Statutes contained a similar provision. 2 Rev. St. 692, § 8. sub. 6.

The fact that the defendants subscribed the constitution and by-laws of the "Lockport Coal Exchange," and participated in its management, was not controverted on the trial. Nor was there any dispute that the object of the organization was to prevent competition in the price of coal among the retail dealers, acting as the "Lockport Coal Exchange," by constituting the exchange the sole authority to fix the price which should be charged by the members individually for coal sold by them. Nor is there any dispute that in pursuance of the plan the exchange did proceed to fix the price of coal, and that the parties to the agreement were thereafter governed thereby in making

sales to their customers. Nor is it questioned that the price first established was seventy-five cents in advance of the then market price, and that there was afterwards a still further advance.

The defendants gave evidence tending to show (and of this there was no contradiction), that before and at the time of the organization of the exchange the successive competition between the dealers in coal in Lockport had reduced the price below the actual cost of the coal and the expense of handling, and that the business was carried on at a loss. It was not shown that the prices of coal, fixed from time to time by the exchange, were excessive or oppressive, or were more than sufficient to afford a fair remuneration to the dealers.

The trial judge submitted the case to the jury upon the proposition that if the defendants entered into the organization agreement for the purpose of controlling the price of coal and managing the business of the sale of coal so as to prevent competition in price between the members of the exchange, the agreement was illegal, and that if the jury found that this was their intent, and that the price of coal was raised in pursuance of the agreement to effect its object, the crime of conspiracy was established. The correctness of this proposition is the main question in the case.

If the confederacy into which the defendants entered was an act "injurious to trade or commerce," irrespective of its results in the particular case, then there is no difficulty in maintaining the conviction. If a combination between independent dealers to prevent competition between themselves in the sale of an article of prime necessity is, in the contemplation of the law, an act inimical to trade or commerce, whatever may be done under and in pursuance of it, and although the object of the combination is merely the due protection of the parties to it against ruinous rivalry, and no attempt is made to charge undue or excessive prices, then the indictment was sustained by proof. On the other hand, if the validity and legality of an agreement having for its object the prevention of competition between dealers in the same commodity depend upon what may be done under the agreement, and is to be adjudged valid or invalid according to the fact whether it is made the means for raising

the price of a commodity beyond its normal and reasonable value, then it would be difficult to sustain this conviction, for it affirmatively appears that the price fixed for coal by the exchange did not exceed what would afford a reasonable profit to the dealers.   It was said by Parker, Ch. J. (Lord Macclesfield), in his celebrated judgment in Mitchel v. Reynolds, 1 P. Wms. 181, which was the case of a bond taken from the defendant on the sale by him to the plaintiff of a lease of a bakehouse, claimed to be void as in restraint of trade, "in all restraints of trade, where nothing more appears, the law presumes them bad; but if the circumstances are set forth, that presumption is excluded; the court is to judge of these circumstances, and to determine accordingly; and if upon them it appears to be a just and honest contract, it ought to be maintained."

If this agreement and what was done under it is to be judged as an isolated transaction, and its rightfulness is to be determined alone upon the peculiar circumstances, whether it did or did not produce an injury to trade, we might well hesitate. The obtaining by dealers of a fair and reasonable price for what they sell does not seem to contravene public policy, or to work an injury to individuals.   On the contrary, the general interests are promoted by activity in trade, which cannot permanently exist without reasonable encouragement to those engaged in it.   Producers, consumers and laborers are alike benefited by healthful conditions of business.

But the question here does not turn on the point whether the agreement between the retail dealers in coal did, as matter of fact, result in injury to the public or to the community in Lockport.   The question is, was the agreement one, in view of what might have been done under it, and the fact that it was an agreement the effect of which was to prevent competition among the coal dealers, upon which the law affixes the brand of condemnation, and which it will not permit.

It has hitherto been an accepted maxim in political economy that "competition is the life of trade."   The courts have acted upon and adopted this maxim in passing upon the validity of agreements the design of which was to prevent competition in trade, and have held such agreements to be invalid.   It is to be

noticed that the organization of the "exchange" was of the most formal character. The articles bound all who became members to conform to the regulations. The observance of such regulations by the members was enforced by penalties and forfeitures. A member accused by the secretary of having violated any provision of the constitution or by-laws was required to purge himself by affidavit, although evidence to sustain the charge should be lacking.

The shippers of coal were to be notified in case of persistent default by the member that "he is not entitled to the privileges of membership in the exchange." No member was permitted to sell coal at less than the price fixed by the exchange.

The organization was a carefully devised scheme to prevent competition in the price of coal among the retail dealers, and the moral and material power of the combination afforded a reasonable guaranty that others would not engage in the business in Lockport except in conformity with the rules of the exchange.

The cases of Hooker v. Vandewater, 4 Den. 349, and Stanton v. Allen, 5 id. 434, are, we think, decisive authorities in support of the judgment in this case. They were cases of combinations between transportation lines on the canals to maintain rates for the carriage of goods and passengers, and the court, in those cases, held that the agreements were void, on the ground that they were agreements to prevent competition, and the doctrine was affirmed that agreements having that purpose, made between independent lines of transportation, were, in law, agreements injurious to trade. In those cases it was not shown that the rates fixed were excessive. In the case in 5th Denio, the judge delivering the opinion referred to the effect of the agreement upon the public revenue from the canals. This was an added circumstance, tending to show the injury which might result from agreements to raise prices or prevent competition. See, also, People v. Fisher, 14 Wend. 10; Arnot v. P. & E. Coal Co., 68 N. Y. 558.

The gravamen of the offense of conspiracy is the combination. Agreements to prevent competition in trade are in contemplation of law injurious to trade, because they are liable to be injuriously used. The present case may be used as an

illustration.   The price of coal now fixed by the exchange may be reasonable in view of the interests both of dealers and consumers, but the organization may not always be guided by the principle of absolute justice.   There are some limitations in the constitution of the exchange, but these may be changed and the price of coal may be unreasonably advanced.   It is manifest that the exchange is acting in sympathy with the producers and shippers of coal.   Some of the shippers were present when the plan of organization was considered, and it was indicated on the trial that the producers had a similar organization between themselves.

If agreements and combinations to prevent competition in prices are or may be hurtful to trade, the only sure remedy is to prohibit all agreements of that character.   If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity, although the moral evidence might be very convincing.

We are of opinion that the principle upon which the case was submitted to the jury is sanctioned by the decisions in this state, and that the jury were properly instructed that if the purpose of the agreement was to prevent competition in the price of coal between the retail dealers, it was illegal and justified the conviction of the defendants.

There is a single remaining question.   The trial judge was requested by the defendant's counsel, in substance, to charge that the overt act required to be proved to sustain a conviction for conspiracy must be one which might injuriously affect the public, and that the act of the defendants in raising the price of coal was of itself not such an overt act as was required.   The request was, we think, properly refused.

The offense of conspiracy was complete at common law on proof of the unlawful agreement.   It was not necessary to allege or prove any overt act in pursuance of the agreement.   3 Ch. Cr. Laws, 142; O'Connell v. Reg, 11 Cl. & Fin. 155.   In this state this rule of the common law was changed by the Revised Statutes, and with certain exceptions it was provided that no agreement should be deemed a conspiracy "unless some act beside such agreement be done to effect the object thereof

by one or more of the parties to such agreement." 2 Rev. St. 692, § 10. And this principle was re-enacted in the Penal Code, section 171.

The object of the statute was to require something more than a mere agreement to constitute a criminal conspiracy. There must be some act in pursuance thereof and done to effect its object, before the crime was consummated. A mere agreement, followed by no act, is insufficient.

The overt act charged in the indictment and proved, was the raising of the price of coal. The raising of the price of coal by a dealer unconnected with any conspiracy is not unlawful, but if there is a conspiracy to regulate the price, and that conspiracy is unlawful, then raising the price is an act done to effect its object, whether the price fixed is reasonable or excessive. The object of the statute is accomplished when it is shown that the parties have proceeded to act upon the agreement and done anything towards effecting its object.

We think there is no error in the record and the conviction should, therefore, be affirmed.

All concur.